UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,        Case No. 13-CR-20617

        Plaintiff,        Hon. Mark A. Goldsmith
  v.        United States District Judge

ADRIAN ROBERTS,

        Defendant.
_____

**United States' Response Opposing
the Defendant's Motion for Compassionate Release**
_____

Beginning in December 2012 and continuing until his arrest in April 2013, Roberts and other co-actors engaged in a spate of robberies of commercial establishments in Flint, Michigan. (PSR ¶ 6). Sometimes Roberts scouted the store before the robbery, checking the layout to assist a co-actor, Tevin Clay, before Clay entered the store with a firearm or a facsimile firearm to rob the store. (PSR ¶¶ 9, 12, 17). On other occasions, Roberts drove Clay to and from the locations of the robbery. (PSR ¶¶ 10-11, 14, 16, 18). Sometimes, Roberts played both roles. (PSR ¶¶ 9, 12).

1

On April 11, 2014, their string of robberies came to an end when police arrested Roberts and Clay driving away from one of the robberies, recovering a firearm, the nearly $5,000 taken in the robbery, a mask, and gloves from a car driven by Roberts. (PSR ¶ 19).

Roberts pleaded guilty to one count of aiding and abetting the brandishing a firearm during and in relation to a crime violence, and one count of aiding and abetting a Hobbs Act robbery, and began serving his current sentence on March 18, 2014. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As

2

of May 28, 2020, these directives have already resulted in at least 3,311 inmates being placed on home confinement. *See* BOP Covid-19 Website.

Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Roberts's failure to meet the criteria in USSG § 1B1.13 also forecloses relief. Even assuming a defendant facing a heightened risk from Covid-19 might satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Roberts does not have a condition that places him at higher risk from Covid-19. Roberts's offense makes him a danger to the community, which precludes release under USSG § 1B1.13(2), because he committed at least eight armed robberies of commercial establishment in the Flint, Michigan area. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)— likewise do not support release because of the serious nature of the offense Roberts committed.

## Background

Roberts's first criminal offense was a major one. In late 2012 into the spring of 2013, Roberts assisted Tevin Clay in committing at least eight armed robberies in the Flint, Michigan area. Clay entered the store on each occasion, pointing a firearm at the store workers and often demanding that they open the safe. Roberts

either conducted surveillance by entering the store prior to Clay robbing the establishment, acted as Clay's driver, or served both roles. In all, the two of them made over $17,000 from these robberies. (PSR ¶¶ 13-19).

On April 11, 2013, the robberies came to an end when Clay's stash of cash he stole from one of the stores contained an extra item---a GPS tracker. (PSR ¶ 18). This allowed police to stop the car, which Roberts was driving, and recover the money, a firearm, a mask, and two gloves.

Roberts pleaded guilty to one count of aiding and abetting the brandishing a firearm during and in relation to a crime violence, and one count of aiding and abetting a Hobbs Act robbery. (PSR ¶ 4).

Roberts's guidelines were 84 months on the first count, and 97-121 months on the Hobbs Act count. The Court sentenced him to 151 months in federal prison in total.

Roberts began serving his prison sentence on March 18, 2014, and is currently incarcerated at FCI Elkton. He is 31 years old, and his projected release date is October 13, 2024. His underlying medical conditions is that he previously had oral cancer in 2015. Roberts has moved for compassionate release, citing his medical

4

condition and the Covid-19 pandemic. He has exhausted his administrative

remedies and the Court can rule on this motion.

## Argument

**I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

### A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within

its facilities. For over almost a decade, the Bureau of Prisons has maintained a

detailed protocol for responding to a pandemic. Consistent with that protocol, the

Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to

implement its Covid-19 Action Plan and minimize the risk of Covid-19

transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations

Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has

repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons

has restricted inmate movement within and between facilities. *See id.* Only limited

group gathering is allowed, and social distancing is maximized. Staff and inmates

are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone

6

allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-

7

26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The

directives require the Bureau of Prisons to identify the inmates most at risk from

Covid-19 and "to consider the totality of circumstances for each individual inmate"

in deciding whether home confinement is appropriate. (03-26-2020 Directive to

BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 3,311

federal inmates have been granted home confinement since the Covid-19 pandemic

began, and that number continues to grow. BOP Coronavirus FAQs. As the

Attorney General's directives have explained, these home-confinement decisions

have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19

pandemic far better than any other solution does. The Bureau of Prisons cannot

open its facilities' gates indiscriminately and unleash tens of thousands of

convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

9

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the

10

Bureau of Prisons."). It is especially true now, given the Bureau of Prisons'

substantial and ongoing efforts to address the Covid-19 pandemic.

## II.    The Court should deny Roberts's motion for compassionate release.

Roberts's motion for a reduced sentence should be denied. A district court has

"no inherent authority . . . to modify an otherwise valid sentence." *United States v.*

*Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district

court's authority to modify a defendant's sentence is "narrowly circumscribed."

*United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific

statutory exception, a district court "may not modify a term of imprisonment once

it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow.

*United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release

under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, if a defendant exhausts, he must show "extraordinary and compelling

reasons" for compassionate release, and release must be "consistent with" the

Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with

the identical language in § 3582(c)(2), compliance with the policy statements

incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560

U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To

11

qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Second*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.    There are no extraordinary and compelling reasons to grant Roberts compassionate release.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under

12

§ 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Roberts and other inmates. Thus, as the Third Circuit has explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597.

14

Roberts's age and medical condition likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. Roberts is only 31 years old, placing him in age group with no increased risk factors.

The attached medical records, filed under seal, along with Roberts's own filings demonstrate that Roberts had a serious medical issue in 2015---oral cancer. But Roberts makes other claims that are not consistent with his medical records.

Roberts contends that he needed but did not receive radiation treatment after doctors removed his tumor. (R. 30: Defendant's Emergency Motion for Compassionate Release: Pg.ID 309). Medical records instead demonstrate that Roberts's doctors determined that radiation was not necessary. (Roberts Medical 2019 at 4, filed under seal, noting that "Roberts was sent to a medical facility to have adjunctive radiation that was later deemed unnecessary and he was sent back to this institution.")

Roberts indicates that his cancer reoccurred in April 2020, and that medical officials removed him from his unit. (R. 30: Deft Comp. Rel. Mot, Pg.ID 309). This is also not consistent with his medical records. It appears that Roberts has seen a specialist annually related to his previous cancer, and that the last visit in

15

September 2019 with "unremarkable findings." (Roberts Medical 2020, filed under seal, at 5). Roberts did become ill in late March into early April, but medical records indicate officials removed him not because of suspected cancer but because he had a Covid-19 like illness. *Id.* at 1. Officials released him back to the general population on April 4, 2020, when he no longer had a fever. *Id.*

Roberts does not actively have cancer and is approaching five years removed from his diagnosis and subsequent treatment. His treatment for that cancer was surgery and never required radiation. A medical oncologist at the Cleveland Clinic has noted that individuals "with a history of cancer who are not currently on therapy and don't have active cancer are probably not at significantly increased risk compared to other people in their age group" for Covid-19 complications. https://www.today.com/health/coronavirus-cancer-risk-survivors-immunocompromised-patients-t175903. Immunocompromised individuals are at a risk for greater complications from Covid-19, but Roberts is no longer immunocompromised given how long ago he had cancer and his form of treatment. He therefore has no extraordinary and compelling circumstances that warrant his release.

16

So whether considered alone or in combination with the Covid-19 pandemic, Roberts's age and medical condition do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

While Roberts notes that FCI Elkton has confirmed cases of Covid-19, Elkton has taken numerous steps to limit the transmission of Covid-19 to the 2500 inmates at the facility. *See Williams v. Wilson,* Application For Stay, 19A1041, https://www.supremecourt.gov/DocketPDF/19/19A1041/143923/20200520154328 301_Wilson%20Stay%20Application%20final.pdf at 10-12. Inmates have access to disinfectant to clean their living space, eat meals in their living area instead of a common area, and mealtimes are staggered so that only one housing unit is moving around the facility bat one time. Elkton staff have been working 12-hour shifts to provide inmates with 24-hour care, isolating symptomatic individuals and not releasing those who have returned from hospital care to the general population until they are fever-free for 72 hours. Officials at FCI Elkton have worked hard to limit the spread of Covid-19 and continue to do so.

Denying Roberts's motion would be consistent with this Court's prior decisions, as this Court previously denied an Elkton inmate's compassionate

17

release motion even with the presence of a risk factor that Roberts does not have. *United States v. Peaks*, No. 16-20460, 2020 WL 2214231, at *1 (E.D. Mich. May 7, 2020)

Finally, even if the combination of Roberts's medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Roberts would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7.

18

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Roberts's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Robert's participation in eight separate armed robberies over a five-month period demonstrates that his release would create a danger to the community.

Roberts is not eligible for compassionate release.

### C.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate

release. Before ordering relief, the Court must consider the factors set forth in 18

U.S.C. § 3553(a) and determine that release is appropriate. *See United States v.*

*Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020)

(holding that the "[d]efendant's circumstances do not warrant compassionate

release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411,

2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate

release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release");

*see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020)

(upholding a district court's denial of compassionate release based on the

§ 3553(a) factors). So even if the Court were to find Roberts eligible for

compassionate release, the § 3553(a) factors should still disqualify him.

The 18 U.S.C. § 3553(a) factors do not favor releasing Roberts based on the

seriousness of the offense that he committed. While Roberts has no other criminal

record, he has admitted taking part in eight total armed robberies of commercial

establishments. The total robbery scheme that he was a part of affected 12 separate

business and 48 total individuals. (PSR ¶ 21).

One victim of this string of robberies wrote of the impact of this offense,

"Couldn't not (sic) sleep for two months. Did not know if I was ever going to see

20

my wife or my family again. I'm still scared til (sic) this day, I don't know when

someone's coming through my front door dress (sic) in black with a gun…" (Govt

Sentencing Memorandum For *United States v. Tevin Clay*, 13-cr-20374, R. 23,

Exhibit A). Another victim details how the robbery has changed her life, noting

that "I now am nervous when I work at night. In fact, I'm apprehensive about

going out anywhere after dark. During my shifts I'm constantly looking, being

suspicious of every person who walks in there. I feel this way because a man

decided to threaten my life. I was in a horrible situation. . . But being scared to

walk out my door is a terribl (sic) feeling to have and I shouldn't have to feel that

way." (Govt. Sentencing Memorandum for *United States v. Tevin Clay*, 13-cr-

20374, R. 23, Exhibit B).

Roberts's actions had a negative and possibly life-long effect on his victims. He

also harmed the community in Flint, as individuals are less likely to shop in stores

that they believed will be robbed. Shortening Roberts's sentence unduly

depreciates the serious nature of this offense and fails to protect the public from

Roberts. The various factors under 18 U.S.C. § 3553(a) do not favor Roberts's

release, as the nature and seriousness of his offense warrants Roberts serving the

original sentence in this matter.

21

**III.    If the Court were to grant Roberts's motion, it should stay the release order pending any appeal by the United States.**

If the Court were inclined to grant Roberts's motion, despite the government's arguments above, the government would request that the Court's release order include two provisions. First, the Court should order that he be subjected to a 14-day quarantine before release. Second, the Court should stay its order pending any appeal by the government to the Sixth Circuit. More specifically, the government would request that if the government files a notice of appeal before the 14-day quarantine ends, the Court's order would automatically be stayed through the completion of any appeal proceedings.

**Conclusion**

Roberts's motion should be denied.

Dated:  May 29, 2020            Respectfully Submitted,

                                MATTHEW SCHNEIDER
                                United States Attorney

                                s/CHRISTOPHER W. RAWSTHORNE
                                Assistant U.S. Attorney
                                600 Church Street
                                Flint, MI 48502
                                Phone: 810-766-5035
                                Email: christopher.rawsthorne@usdoj.gov
                                WI State Bar No.: 1059889

22

**Certificate of Service**

I certify that on May 28, 2020, the foregoing document was electronically filed by an employee of the United States Attorney's Office with the Clerk of the Court using the ECF system, and that because of teleworking due to COVID-19 a copy of the response was mailed on, Saturday, May 30, 2020, to the pro se defendant at this address:

Adrian Roberts
Reg. No. 48347-039
FCI Elkton
8730 Scroggs Road
Lisbon, Oh  44432

s/CHRISTOPHER W. RAWSTHORNE
United States Attorney's Office
600 Church Street
Flint, Michigan 48502

23